IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:19-cv-00316-D

BERKSHIRE LIFE INSURANCE
COMPANY OF AMERICA,

        Plaintiff,

v.

AMRIKA RAMPERSAD,

        Defendant.

**DEFENDANT'S RESPONSE
TO PLAINTIFF'S RULE 56.1
STATEMENT OF MATERIAL
FACTS**

Defendant Amrika Rampersad ("Dr. Rampersad"), through counsel and pursuant to Local Rule 56.1(a)(1), submits the following Responses to Plaintiff Berkshire Life Insurance Company of America's ("Plaintiff") Rule 56.1 Statement of Material Facts.

**DR. RAMPERSAD APPLIES FOR DISABILITY INCOME INSURANCE**

1.     In January 2017, Dr. Rampersad lived in Fort Myers, Florida. [App'x Ex. A (Rampersad Dep.) at 11:8-10, 11:25-12:4]

**RESPONSE:** Admitted.

2.     At the time, Dr. Rampersad worked more than 30 hours per week as a general dentist. [App'x Ex. A (Rampersad Dep.) at 12:9-13]

**RESPONSE:** Admitted.

3.     Dr. Rampersad had a disability income insurance policy with Berkshire dating back to 2014. [App'x Ex. A (Rampersad Dep.) at 61:10-22]

**RESPONSE:** Admitted.

1

4. Nevertheless, Dr. Rampersad wanted additional coverage because her income had recently increased. [App'x Ex. A (Rampersad Dep.) at 61:23-62:16]

**RESPONSE:** Admitted.

5. Dr. Rampersad engaged the services of an insurance agency, Robert Fine & Associates, primarily working with an agent named Matt Fine. [App'x Ex. A (Rampersad Dep.) at 63:7-20]

**RESPONSE:** Admitted to the extent that Dr. Rampersad engaged the services of Robert Fine & Associates. Robert Fine & Associates is an agent of Plaintiff's as the agency is licensed to solicit applications for insurance policies with Plaintiff. (Appx. Exhibit A, Pl's Resp. to Def's Req. to Admit 15; *See* N.C.G.S. § 58-33-10(1)).

6. Dr. Rampersad did not communicate directly with Berkshire, but her relevant communications were conducted by Mr. Fine and his agency. [App'x Ex. A (Rampersad Dep.) at 65:20-66:7]

**RESPONSE:** Admitted.

7. In February 2017, Dr. Rampersad submitted an application for Disability Insurance: Part I (the "Employment History"). [App'x Ex. A (Rampersad Dep.) at 66:7-14]

**RESPONSE:** Admitted.

8. The Employment History asked, "How many hours per week are you at work in this occupation?" Dr. Rampersad answered "40+." [App'x Ex. B (Employment History) at 3 ¶ C]

**RESPONSE:** Admitted.

9. The Employment History asked, "Do you plan to change your occupation, job, or employment within the next six months?" Dr. Rampersad answered, "No." [App'x Ex. B (Employment History) at 4 ¶ L]

**RESPONSE**: Admitted.

2

10.    The Employment History contained the following language:

1.    This Application for Disability insurance: Part I, Application for Insurance: Part II — Health and Medical History, any required Representations to the Medical Examiner, and any other supplements or amendments to this Application For Disability Insurance: Part I will form the basis for, and become part of and attached to any policy or coverage issued and is herein referred to as the "Application."

2.    All of the statements that are part of this Application are correctly recorded, and are correct and true to the best of the knowledge and belief of those persons who made them.

3.    No agent, broker or medical examiner has any right to accept risks, make or change contracts, or to waive or modify any of the Company's rights or requirements.

4.    Information provided by the applicant are representations and not warranties. Any misrepresentation or omission, if found to be material, may adversely affect acceptance of the risk, claim payment, or may lead to rescission of any policy that is issued based on this Application.

      . . .

6.    The policy date is the date from which premiums are calculated and become due. . . .[N]o insurance shall take effect unless and until the policy is delivered, the first premium is paid, and there has been no change in the health, the income level, status of employment or occupation of the proposed insured.

[App'x Ex. B (Employment History) at 9]

**RESPONSE**: Admitted.

11.    Dr. Rampersad read and signed the Employment History. [App'x Ex. A (Rampersad Dep.) at 67:12-21]

**RESPONSE**: Admitted.

12.    In February 2017, Dr. Rampersad submitted an Application Part II – Health and Medical History (the "Medical History"). [App'x Ex. A (Rampersad Dep.) at 68:10-69:2]

3

**RESPONSE**: Admitted.

13.     The Medical History asked "Are you currently receiving any medical advice, counseling, or treatment from a licensed physician for any medical . . . condition?" Dr. Rampersad answered, "No." [App'x Ex. C (Medical History) at 2 ¶ A1]

**RESPONSE**: Admitted.

14.     The Medical History also asked, "In the past ten years, have you been diagnosed or treated for . . . any disease or disorder of the joints, limbs, or muscles;" and "Other than previously stated in this [Medical History], have you . . . within the past 12 months had any diagnostic test(s) performed (except for HIV or AIDS)." Dr. Rampersad answered "No" to these questions. The Medical History further asked, "Other than previously stated in this [Medical History], have you . . . within the past 5 years had a physical exam or check-up of any kind; "Other than previously stated in this [Medical History], have you within the past 5 years . . . been a patient in a hospital, clinic, or other medical or mental health facility?" Dr. Rampersad answered "Yes" to these questions and disclosed that she "had annual physicals & routine check ups." [App'x Ex. C (Medical History) at 2 ¶ C5, 3 ¶¶ E1, E2, E3, 4]

**RESPONSE**: Admitted.

15.     The Medical History also contains the following language: "I understand and agree that the statements and answers in this [Medical History] are written as made by me, to the best of my knowledge and belief are full, complete and true, and that they shall be part of the contract of insurance, if issued." [App'x Ex. C (Medical History) at 4]

**RESPONSE**: Admitted.

16.     Dr. Rampersad read and signed the Medical History. [App'x Ex. A (Rampersad Dep.) at 68:7-69:2]

**RESPONSE**: Admitted.

4

17.     Relying on the representations in the Application and Medical History, Berkshire issued disability insurance income policy number Z3585720 (the "5720 Policy") with a Policy Date of May 3, 2017. (App'x Ex. M (Cowdrey Decl.) ¶ 17; App'x Ex. D (5720 Policy) at 3]

**RESPONSE**: Admitted in part, disputed in part.  Dr. Rampersad admits that Berkshire issued disability insurance income policy number Z3585720 (the "5720" Policy") with a Policy Date of May 3, 2017.  Dr. Rampersad disputes that the policy was issued by relying on the representations in the Application and Medical History.  Dr. Rampersad is not employed by Plaintiff, consequently, she does not have any specific knowledge of the processes Plaintiff employs in determining eligibility for coverage and, therefore, does not possess the knowledge to either admit or dispute. (Appx. Ex. C, Dep. of Amrika Rampersad, at 77:20-23).

18.     The 5720 Policy contained the following language: "We have issued the Policy in consideration of the representations in the application and payment of the first premium. . . . The Policy with any application(s), Schedule Pages, and any attached riders, amendments, and endorsements make up the entire contract. No change in the Policy will be valid unless it has been endorsed on, or attached to, the Policy in writing by the president, a vice president, or the secretary of Berkshire Life."  [App'x Ex. D (5720 Policy) at 22–23]

**RESPONSE**:  Admitted.

19.     Although premiums were calculated and became due based on the May 3 issue date, the 5720 Policy did not immediately go into force because Dr. Rampersad had not yet signed the delivery requirements or paid any premiums. [See, e.g., App'x Ex. B (Employment History) at 9 ¶ 6]

**RESPONSE**: Admitted.

### DR. RAMPERSAD QUITS HER JOB AND SUFFERS TWO INJURIES

20.     In 2017, Dr. Rampersad's husband, an interventional radiologist, accepted a job at

5

WakeMed in Raleigh, North Carolina. [App'x Ex. A (Rampersad Dep.) at 14:18-15:10, 17:16-20]

**RESPONSE**: Admitted. Dr. Rampersad would clarify that her husband accepted the job sometime in mid- to late-June 2017. (Appx. Ex. C at 17:13-23).

21. In response, Dr. Ramperad quit her job and moved to North Carolina. Dr. Rampersad did not do anything in North Carolina until after her husband accepted the new position. [App'x Ex. A (Rampersad Dep.) at 14:18-15:10, 19:24-20:6]

**RESPONSE**: Admitted in part. When her husband accepting employment in North Carolina, Dr. Rampersad quit her job and re-located to North Carolina. Upon relocating to North Carolina, Dr. Rampersad immediately began seeking full-time employment. Dr. Rampersad cannot admit or dispute the term "did not do anything in North Carolina until after her husband accepted the new position" because such a statement is vague, ambiguous, and lacks clarity. (Appx. Ex. C at 27:7-13).

22. Dr. Rampersad applied for a North Carolina dental license. [App'x Ex. A (Rampersad Dep.) at 20:7-23]

**RESPONSE**: Admitted.

23. Dr. Rampersad does not remember when she applied for her North Carolina dental license, but at least four days elapsed between her submitting her application to the North Carolina Board of Dental Examiners and the issuance of her dental license. [App'x Ex. A (Rampersad Dep.) at 20:7-21:4; N.C. Board of Dental Examiners, Dental License Application, NCDENTALBOARD.ORG, https://www.ncdentalboard.org/dental.htm (last visited Sept. 2, 2020)]

**RESPONSE**: Admitted in part, disputed in part. Dr. Rampersad admits that she does not remember when she applied for her North Carolina dental license, and because she lacks this

knowledge she cannot say how much time elapsed between the filing and the issuance of the dental license. (Appx. Ex. C at 21:20-23:22).

24.     Dr. Rampersad's North Carolina dental license was issued June 16, 2017. . [App'x Ex. A (Rampersad Dep.) at 23:10-22; App'x Ex. E (N.C. Dental Board Record)]

**RESPONSE**: Admitted to the extent that the North Carolina Board of Dental Examiners lists her licensing date as June 16, 2017.

25.     Following her move, Dr. Rampersad did not work full-time again until November 2017. [App'x Ex. A (Rampersad Dep.) at 27:1-28:5, 29:3-10, 32:4-15]

**RESPONSE**: Disputed.  Dr. Rampersad was a per diem employee from at least August 2017 until she was hired on a permanent basis in November 2017.  To the best of her knowledge, she worked full-time hours most weeks until she was hired permanently.  (Appx. Ex. D, Def's Ans. To Pl's Int. #1; Ex. E, Def's Resp. to Pl's Req. to Admit #13-14; Ex. C at 27:14-36:1).

26.     Before moving, Dr. Rampersad suffered a workplace accident in which an assistant sprayed too much air into a patient's mouth, causing blood and saliva to splash onto Dr. Rampersad's face.  [App'x Ex. A (Rampersad Dep.) at 47:19-48:4, 50:8-51:19, 51:20-25]

**RESPONSE:** Disputed.  Dr. Rampersad did not suffer a workplace accident, rather, she was exposed to bodily fluids from a patient. Dr. Rampersad was exposed daily to blood and saliva by virtue of her occupation as a general dentist.  (Ex. E #1; Ex. C at 47:12-48:4; Ex. D #2).

27.     Some of the patient's blood got behind Dr. Rampersad's safety goggles and into her eyes. [App'x Ex. A (Rampersad Dep.) at 47:19-48:4]

**RESPONSE:** Admitted.

28.     Dr. Rampersad later reported this accident to her physician and asked the physician to run bloodwork for potential exposure to blood borne pathogens, such as HIV and Hepatitis C

[App'x Ex. A (Rampersad Dep.) at 50:8-51:25]

**RESPONSE:** Admitted in part, disputed in part. Dr. Rampersad admits that she asked a physician to run bloodwork for potential exposure to blood borne pathogens, such as HIV and Hepatitis C. Dr. Rampersad disputes that she asked for this testing due to the specific exposure incident. It was Dr. Rampersad's practice, due to her occupation, to routinely ask for such tests. Dr. Rampersad also disputes the classification of the exposure as an "accident." See response to #26. (Id).

29. This workplace accident occurred before June 13, 2017. [App'x Ex. A (Rampersad Dep.) at 51:20-25].

**RESPONSE.** Admitted in part, disputed in part. Dr. Rampersad admits that the exposure occurred before June 13, 2017. Dr. Rampersad disputes that it was a workplace accident. See #26. (Id).

30. While preparing to move to North Carolina, Dr. Rampersad severely injured her right ankle. [App'x Ex. A (Rampersad Dep.) at 45:21-22]

**RESPONSE:** Admitted.

31. This injury resulted in a torn ligament in Dr. Rampersad's right ankle. [App'x Ex. A (Rampersad Dep.) at 59:8-60:3]

**RESPONSE:** Admitted to the extent that this information is documented in her medical records.

32. This injury also resulted in a torn tendon in Dr. Rampersad's right ankle. [App'x Ex. A (Rampersad Dep.) at 60:4-16]

**RESPONSE:** Admitted to the extent that this information is documented in her medical records.

33.     As a result of this injury, Dr. Rampersad experienced constant, shooting, and throbbing pain that she rated at 8 out of 10. [App'x Ex. A (Rampersad Dep.) at 40:6-41:6]

**RESPONSE:** Admitted to the extent that this information is documented in her medical records.

34.     Dr. Rampersad's doctors recommended surgery to repair the damage. [App'x Ex. A (Rampersad Dep.) at 60:17-20]

**RESPONSE:** Admitted.

35.      Dr. Rampersad's ankle remained swollen until at least October 2017. [App'x Ex. A (Rampersad Dep.) at 54:8-10]

**RESPONSE:** Disputed.   Dr. Rampersad reported to her physician that she was experiencing "some" swelling during the October 2017 doctor visit. To the best of her knowledge, Dr. Rampersad was not experiencing constant swelling in her right ankle from the time of injury until October 2017. (Appx. Ex. C at 44:13-15; 54:2-10).

36.     Dr. Rampersad's right ankle injury occurred no later than June 26, 2017. [App'x Ex. A (Rampersad Dep.) at 39:24-40:1, 52:14-19]

**RESPONSE:** Admitted in part, disputed in part.  Dr. Rampersad admits that her injury occurred prior to June 26, 2017.  However, she disputes the phrase "occurred no later than."  Dr. Rampersad suffered an acute injury to her right ankle, therefore, the injury happened in very close proximity to June 26, 2017 as it required prompt medical attention. (Appx. Ex. C at 39:12-41:3; 41:22-42:11; 45:21-46:11; 52:3-19).

37.     Right ankle pain can be particularly problematic for dentists because dentists must use foot pedals to operate tools when they treat patients. [App'x Ex. A (Rampersad Dep.) at 54:2556:14]

9

**RESPONSE:** Disputed. Dr. Rampersad can only speak to how her injury affected her, and she cannot opine regarding right ankle pain in dentists generally. (Appx. Ex. C at 54:25-56:14).

38.      By July 25, 2017, Dr. Rampersad had quit her job, was not working full time, and had suffered the blood exposure and right ankle/leg injuries discussed above. [App'x Ex. A (Rampersad Dep.) at 79: 16-80:23, 85:16-86:20]

**RESPONSE:** Admitted in part, disputed in part. Dr. Rampersad admits that she was no longer employed with Riverdale Dental as of July 25, 2017. Dr. Rampersad admits that she did suffer blood exposure and the right ankle/leg injury prior to July 25, 2017. Dr. Rampersad actively pursued full-time employment upon her move to North Carolina around the first of July 2017. (Appx. Ex. C at 27:14-36:1). She began working shortly after she relocated to North Carolina working various temporary assignments and performing "hands on" interviews with various practices, sometimes for several days at a time. (Id). She began working with Riccobene Family Dentistry on a per diem basis in August 2017 and, to the best of her knowledge, was working approximately full-time hours during that time. (Id. at 30:4-31:23). She was hired on a permanent basis in November 2017, and officially became a full-time employee. (Id. at 28:22-29:10).

**THE 5720 POLICY GOES INTO FORCE**

39.      In June 2017, Dr. Rampersad submitted an Amendment in connection with the 5720 Policy. [App'x Ex. M (Cowdrey Decl.) Exhibit 1 at 2–4]

**RESPONSE:** Admitted.

40.      The Amendment contains the following language: "It is further represented that the statements and answers in said [Employment History and Medical History] were complete and true when made and that no changes have occurred which make said statements and answers incorrect or incomplete as of the present date." [App'x Ex. M (Cowdrey Decl.) Exhibit 1 at 2-4]

**RESPONSE:** Admitted.

41.     Dr. Rampersad read and signed the Amendment to the 5720 Policy. [App'x Ex. A (Rampersad Dep.) at 71:0-17]

**RESPONSE:** Admitted.

42.     In June 2017, Dr. Rampersad submitted a Policy Delivery Receipt in connection with the 5720 Policy. [App'x Ex. M (Cowdrey Decl.) Exhibit 1 at 6]

**RESPONSE:** Admitted.  For the purposes of clarification, Dr. Rampersad signed the document on June 1, 2017, and it was transmitted to Plaintiff on June 12, 2017. (Appx. Ex. F, June 12-13, 2017 emails).

43.     The     Policy     Delivery     Receipt     contains     the     following language: "The Applicant/Insured represents that the statements and answers in the . . . documents required as part of the application for the policy were complete and true when made, and that no changes have occurred that would make said statements and answers incorrect or incomplete as of the present date, except as amended or modified in any amendment(s) attached thereto." [App'x Ex. M (Cowdrey Decl.) Exhibit 1 at 6]

**RESPONSE:** Admitted.

44.     Dr. Rampersad read and signed the Policy Delivery Receipt for the 5720 Policy. [App'x Ex. A (Rampersad Dep.) at 73:12-21]

**RESPONSE:** Admitted.

45.     In June 2017, Dr. Rampersad submitted a Declaration of Insurability in connection with the 5720 Policy. [App'x Ex. M (Cowdrey Decl.) Exhibit 1 at 5]

**RESPONSE:** Admitted.  For the purposes of clarification, Dr. Rampersad signed the document on June 1, 2017, and it was transmitted to Plaintiff on June 12, 2017. (Id).

46.     The Declaration of Insurability contains the following language: "The undersigned certifies that since the date of the earlier of [the Employment History or Medical History] , no person proposed for insurance has had any disease, illness, or injury; . . . has consulted or treated by a doctor; . . .  has had any change in occupation, income, residence, tobacco use, or aviation status." [App'x Ex. M (Cowdrey Decl.) Exhibit 1 at 5 ¶¶ 1, 4, 6]

**RESPONSE:** Admitted.

47.     Dr. Rampersad read and signed the Declaration of Insurability for the 5720 Policy. [App'x Ex. A (Rampersad Dep.) at 72:14-24, 73:8-11]

**RESPONSE:** Admitted.

48.     The Amendment, Delivery Receipt, and Declaration of Insurability for the 5720 Policy do not indicate that Dr. Rampersad had or planned to quit her job, that she had been exposed to patient's blood, or that she had suffered a right ankle injury. [*See* App'x Ex. M (Cowdrey Decl.) Exhibit 1]

**RESPONSE:** Disputed.  As of June 1, 2017, the date that Dr. Rampersad completed the Amendment, Delivery Receipt, and Declaration of Insurability for the 5720 Policy, she had not experienced a change in occupation.  Her husband had applied for a job in North Carolina, however, as of the date that the above referenced documents were signed, her husband had not yet been hired and, therefore, Dr. Rampersad did not have an active plan to quit her job.  Dr. Rampersad was still employed full-time.  While she had been exposed to a patient's blood, the exposure was not a disease, illness, or injury.  Finally, Dr. Rampersad, while not remembering the exact date of the right ankle injury, suffered the injury in very close proximity to June 26, 2017 and, therefore, would have suffered the right ankle injury after the signing of the above referenced forms. See # 20, 21, 25, 26, 28, and 36.  (Appx. Ex. C 17:16-19:6; 21:10-19; 26:23-25).

49.     On June 13, 2017, Berkshire received Dr. Rampersad's first premium payment in connection with the 5720 Policy. [App'x Ex. F (Berkshire's Discovery Responses) at Response to Interrogatory 12]

**RESPONSE:** Admitted.

50.     Dr. Rampersad's first payment – for $125.23 – represented one month's worth of premiums and therefore covered the period May 3, 2017 through June 3, 2017. [App'x Ex. F. (Berkshire's Discovery Responses) at Response to Interrogatory 12]

**RESPONSE:** Admitted in part, disputed in part.  Dr. Rampersad admits that the first payment was for $125.23, however, it was her understanding that the policy effective date was in June 2017, not May.  (Appx. Ex. G, July 24, 2017 email from Kelly Gatewood to Berkshire).

51. Per the terms of the contract, the 5720 Policy went into force on June 13, 2017. [*See, e.g.*, App'x Ex. B (Employment History) at 9 ¶ 6]

**RESPONSE:** Admitted.

52.     Had Dr. Rampersad disclosed a current or planned change in her employment status, Berkshire would not have issued the 5720 Policy. [App'x Ex. M (Cowdrey Decl.) ¶ 19]

**RESPONSE:** Disputed.  As of June 1, 2017, the date of the signing of the Amendment, Policy Delivery Receipt, and Declaration of Insurability, Dr. Rampersad was still employed on a full-time basis with no active plan to change her employment.  Dr. Rampersad made no misrepresentation regarding her employment.  See #48.

53.     Had Dr. Rampersad disclosed an exposure to another person's blood, Berkshire would not have issued the 5720 Policy as it did. [App'x Ex. M (Cowdrey Decl.) ¶ 20]

**RESPONSE:** Disputed.  Dr. Rampersad's exposure to a patient's blood was not a disease, illness, or injury.  Further, such exposure is within the normal course and scope of an individual's

employment as a dentist.  Consequently, Dr. Rampersad did not make a misrepresentation relating to the blood exposure.  See #26 & #48.

54.     Had Dr. Rampersad disclosed her right ankle injury, Berkshire would not have issued the 5720 Policy as it did. [App'x Ex. M (Cowdrey Decl.) ¶ 21]

**RESPONSE:** Disputed. Dr. Rampersad's right ankle injury occurred after the signing of the Amendment, Delivery Receipt, and Declaration of Insurability.  Dr. Rampersad signed the forms on June 1, 2017, and the right ankle injury happened immediately before June 26, 2017. Consequently, Dr. Rampersad did not make a misrepresentation relating to her ankle injury.  See #36 & #48.

### DR. RAMPERSAD REJECTS THE 5720 POLICY AND REQUESTS A NEW ONE

55.     On July 15, 2017, Berkshire began automatically drafting premiums due for the 5720 Policy. [App'x Ex. F (Berkshire's Discovery Responses) at Response to Interrogatory 12]

**RESPONSE:** Admitted.

56.     Berkshire's first automatic draft was for $250.46 – representing premiums due for June and July 2017. [App'x Ex. F (Berkshire's Discovery Responses) at Response to Interrogatory 12]

**RESPONSE:** Disputed.   It was Dr. Rampersad's understanding that the $250.46 represented a "double charge" for premiums under the policy. (Appx. Ex. C at 74:10-76:25; Ex. G).

57.     This draft brought Dr. Rampersad's account current. [App'x Ex. F (Berkshire's Discovery Responses) at Response to Interrogatory 12]

**RESPONSE:** Disputed.   It was Dr. Rampersad's understanding that the $250.46 represented a "double charge" for premiums under the policy. (Id).

58.     Berkshire sent a notice explaining the procedure. [App'x Ex. F (Berkshire's Discovery Responses) at Response to Interrogatory 12; App'x Ex. G]

**RESPONSE:** Disputed.  Dr. Rampersad does not recall receiving a notice explaining the procedure. (Appx. Ex. C at 74:14-17).

59.     On July 24, 2017, Dr. Rampersad's agent asked Berkshire if the policy date for the 5720 Policy could be changed from May to June. [App'x Ex. H (Email Chain) at 12]

**RESPONSE:** Admitted in part, disputed in part.  Dr. Rampersad admits that Matt Fine asked Berkshire if the policy date could be changed, however, Matt Fine was Plaintiff's agent.  See #5.

60.     Dr. Rampersad's agent did so because Dr. Rampersad wanted to skip the next month's premium payment. [App'x Ex. H (Email Chain) at 12]

**RESPONSE:** Disputed.   Mr. Fine's agency asked for the policy date to be changed because Dr Rampersad understood the policy to have an effective date of June 2017 rather than May 2017. See #5.

61.     Berkshire does not change policy dates after a policy has been placed into force. [App'x Ex. M (Cowdrey Decl.) ¶ 13]

**RESPONSE:** Disputed.  Every employee of Plaintiff that Mr. Fine's agency contacted affirmatively represented that the policy date could be changed to June 13. 2017.  (Appx. Ex. H, Emails between Plaintiff's employees and Plaintiff's employees and Mr. Fine regarding policy date change).

62.     If changes need to be made within 90 days, however, Berkshire will sometimes issue a new policy under a new policy number. [App'x Ex. M (Cowdrey Decl.) ¶ 14]

**RESPONSE:** Disputed.  See #61. (Appx. Ex. H).

15

63.     On July 25, 2017, Berkshire told Dr. Rampersad's agent that the 5720 Policy's "true effective date" was June 13, 2017. Berkshire also told the agent that, in order to skip the month's payment, "the client will need to resign deliveries as we'll have to reissue to a new policy number. Once you give me the go ahead I can have the team start working on the reissue." The agent replied, "Yes. Please go ahead. Client will sign new delivers." [App'x Ex. H (Email Chain) at 1–4]

**RESPONSE:** Admitted in part, disputed in part. Matt Fine was Plaintiff's agent. See #5.

64.     In response to the agent's request, and still relying on Dr. Rampersad's representations in the Application and Medical History, Berkshire issued a new policy – number Z3724950 (the "4950 Policy). [App'x Ex. M (Cowdrey Decl.) ¶ 22]

**RESPONSE:** Disputed. Plaintiff did not advise that an entirely new policy was going to be issued. Rather, Plaintiff advised that the policy was going to be re-issued with a new policy number. Plaintiff only ever advised that the original policy could be re-dated or re-issued. Rampersad is not employed by Plaintiff, therefore, she does not have any specific knowledge of the processes Plaintiff employs in determining eligibility for coverage. See #17. (Appx. Ex. H).

65.     Dr. Rampersad submitted an Amendment in connection with the 4950 Policy. [App'x Ex. I (Amendment to 4950 Policy)]

**RESPONSE:** Admitted.

66.     The Amendment contains the following language: "It is further represented that the statements and answers in said [Employment History and Medical History] were complete and true when made and that no changes have occurred which make said statements and answers incorrect or incomplete as of the present date." [App'x Ex. I (Amendment to 4950 Policy)]

**RESPONSE:** Admitted.

67.     Dr. Rampersad read and signed the Amendment to the 4950 Policy. [App'x Ex. A

(Rampersad Dep.) at 81:21-82:19]

**RESPONSE:** Admitted.

68.     Dr. Rampersad submitted a Policy Delivery Receipt in connection with the 4950 Policy. [App'x Ex. K (Delivery Receipt for 4950 Policy)]

**RESPONSE:** Admitted.

69.     The     Policy Delivery     Receipt     contains     the     following language: "The Applicant/Insured represents that the statements and answers in the . . . documents required as part of the application for the policy were complete and true when made, and that no changes have occurred that would make said statements and answers incorrect or incomplete as of the present date, except as amended or modified in any amendment(s) attached thereto." [App'x Ex. K (Delivery Receipt for 4950 Policy)]

**RESPONSE:** Admitted.

70.     Dr. Rampersad read and signed the Policy Delivery Receipt for the 4950 Policy. [App'x Ex. A (Rampersad Dep.) at 88-6]

**RESPONSE:** Admitted.

71.     Dr. Rampersad submitted a Declaration of Insurability in connection with the 4950 Policy. [App'x Ex. J (Declaration of Insurability for 4950 Policy)]

**RESPONSE:** Admitted.

72.     The Declaration of Insurability contains the following language: "The undersigned certifies that since the date of the earlier of [the Employment History or Medical History] , no person proposed for insurance has had any disease, illness, or injury; . . . has consulted or treated by a doctor; . . .  has had any change in occupation, income, residence, tobacco use, or aviation status." [App'x Ex. J (Declaration of Insurability for 4950 Policy) ¶¶ 1, 4, 6]

17

**RESPONSE:** Admitted.

73.     Dr. Rampersad read and signed the Declaration of Insurability for the 4950 Policy. [App'x Ex. A (Rampersad Dep.) at 83:12-84:14]

**RESPONSE:** Admitted.

74.     The Amendment, Delivery Receipt, and Declaration of Insurability for the 4950 Policy do not indicate that Dr. Rampersad had or planned to quit her job, that she had been exposed to a patient's blood, or that she had suffered a right ankle injury. [App'x A Exs. I, J, K]

**RESPONSE:** Disputed.   Dr. Rampersad was told to complete the 4950 forms with knowledge that was true and accurate as the policy effective date of June 13, 2017.  That is what she did.  Therefore, as of June 13, 2017 she had not quit her job nor, to the best of her knowledge, had her husband accepted employment in North Carolina.  The exposure to the patient's blood was not an illness, injury, or disease.  Finally, as of June 13, 2017, she had not suffered the right ankle injury.  Consequently, Dr. Rampersad completed the 4950 forms with information that was true and accurate, to the best of her knowledge, as of June 13, 2017. (Appx. Ex. C at 79:16-81:3; 85:2-87:18).

75.     By July 25, 2017, Dr. Rampersad was no longer working full time and had suffered the right ankle/leg injury and workplace blood exposure discussed above. [App'x Ex. A (Rampersad Dep.) at 79: 16-80:23, 87:7-11]

**RESPONSE:** Admitted in part, disputed in part.  Dr. Rampersad admits that she suffered a right ankle/leg injury and workplace blood exposure.  Dr. Rampersad actively pursued full-time employment upon her move to North Carolina around the first of July 2017. (Appx. Ex. C at 27:14-36:1).  She began working shortly after she relocated to North Carolina working various temporary assignments and performing "hands on" interviews with various practices, sometimes for several days at a time. (Id).  She began working with Riccobene Family Dentistry on a per diem basis in

18

August 2017 and, to the best of her knowledge, was working approximately full-time hours during that time. (Id. at 30:4-31:23). She was hired on a permanent basis in November 2017, and officially became a full-time employee. (Id. at 28:22-29:10).

76. Dr. Rampersad knew that she had not disclosed to Berkshire information called for by the Amendment, Delivery Receipt, and Declaration of Insurability for the 4950 Policy. [App'x Ex. A (Rampersad Dep.) at 79:16-81:3, 85:2-

**RESPONSE:** Disputed. Dr. Rampersad did not disclose a change in employment or the right ankle injury because she was advised that the effective date of the policy was June 13, 2017, therefore, she completed the forms with information that was true and accurate as of that date. She did not disclose the blood exposure because it was not a disease, injury, or illness and, therefore, was not required to be disclosed. (Appx. Ex. C at 79:16-81:3; 85:2-87:18).

77. Had Dr. Rampersad disclosed her change in employment status, Berkshire would not have issued the 4950 Policy. [App'x Ex. M (Cowdrey Decl.) ¶ 24]

**RESPONSE:** Disputed. June 13, 2017 is the effective date of the policy. Everything that Dr. Rampersad disclosed to Plaintiff was true and accurate as of that date. She was working full-time on June 13, 2017, had not experienced a change in occupation and, to the best of her knowledge, had no immediate plans to change employment. (Appx. Ex. C at 79:16-81:3; 85:2-87:18).

78. Had Dr. Rampersad disclosed her exposure to another person's blood, Berkshire would not have issued the 4950 Policy as it did. [App'x Ex. M (Cowdrey Decl.) ¶ 25]

**RESPONSE:** Disputed. Dr. Rampersad's exposure to another person's blood was not a disease, illness, or injury, nor did she seek medical treatment for the exposure prior to the policy effective date. Therefore, the blood exposure was not required to be disclosed. (Appx. Ex. C at 79:16-81:3; 85:2-87:18).

19

79.     Had Dr. Rampersad had disclosed her right ankle injury, Berkshire would not have issued the 4950 Policy as it did. [App'x Ex. M (Cowdrey Decl.) ¶ 26]

**RESPONSE:** Disputed.  Plaintiff represented to Dr. Rampersad that the "true effective date" of the policy was June 13, 2017.  Therefore, that is the policy's effective date.  Dr. Rampersad disclosed all facts that were true and accurate as of June 13, 2017.  Dr. Rampersad's ankle injury did not occur until sometime immediately before June 26, 2017.  (Appx. Ex. C at 79:16-81:3; 85:2-87:18).

80.     After receiving these documents from Dr. Rampersad, Berkshire deemed the 5720 Policy rejected and applied Dr. Rampersad's premium payments to the 4950 Policy. [App'x Ex. F (Berkshire's Discovery Responses) at Response to Interrogatory 13]

**RESPONSE:** Disputed.  Plaintiff represented to Dr. Rampersad that it was going to re-issue the policy and re-date it with a June 13, 2017 effective date.  Plaintiff never told Dr. Rampersad or Mr. Fine that an entirely new policy would be issued, nor did Plaintiff ever tell Dr Rampersad or Mr. Fine that the effective date of the policy would be anything other than  June 13, 2017.  It was not until Dr. Rampersad submitted a claim for benefits under the policy that Plaintiff, for the first time, attempted to assert that the effective date of the policy was anything other than June 13, 2017.  Further, Plaintiff never advised that in order for the re-date of the policy to become effective the 5720 policy had to be rejected.  (Appx. Ex. H).

81.     As a result, the 4950 Policy went into force on July 25, 2017. [App'x Ex. F (Berkshire's Discovery Responses) at Response to Interrogatory 13]

**RESPONSE:** Disputed.  Plaintiff advised Dr. Rampersad that the effective date of the policy was June 13, 2017.  No individual with Plaintiff ever advised that the policy went into force on July 25, 2017 until she submitted an application for disability benefits under the policy.  (Id).

## DR. RAMPERSAD'S DISABILITY AND GUARDIAN'S RESPONSE

82.    In 2018, Dr. Rampersad suffered a right leg injury. [App'x Ex. A (Rampersad Dep.) at 90:19-91:4]

**RESPONSE:** Admitted.

83.    Dr. Rampersad filed two disability claims with Berkshire – one under the old policy from 2014, and another under the 4950 Policy. [App'x Ex. A (Rampersad Dep.) at 61:10-22, 90:1114]

**RESPONSE:** Admitted.

84.    Berkshire investigated Dr. Rampersad's claims and determined that she met the definition of "disability" under the old 2014 Policy. [App'x Ex. A (Rampersad Dep.) at 61:10-22]

**RESPONSE:** Admitted.

85.    Berkshire began paying Dr. Rampersad's claim under the 2014 policy. [App'x Ex. A (Rampersad Dep.) at 61:10-22]

**RESPONSE:** Admitted.

86.    Berkshire continues to pay Dr. Rampersad's claim under the 2014 policy. [App'x Ex. A (Rampersad Dep.) at 61:10-22]

**RESPONSE:** Admitted.

87.    On March 27, 2019, Berkshire sent Dr. Rampersad a letter explaining its decision to rescind the 4950 Policy. [App'x Ex. L (Rescission Letter)]

**RESPONSE:** Admitted.

88.    Berkshire also tendered a refund of all premiums it had received in connection with the 4950 Policy. [App'x Ex. A (Rampersad Dep.) at 96:19-23]

**RESPONSE:** Admitted.

89.     Dr. Rampersad did not accept Berkshire's tender and instead hired counsel. [App'x

Ex. A (Rampersad Dep.) at 96:24-97:8]

**RESPONSE:** Admitted.


s/ M. Leila Louzri_____
M. Leila Louzri, Esq.
N.C. Federal Bar #:  48743
Nathaniel W. Bax, Esq.
*Pro Hac Vice*
**FOSTER LAW FIRM, L.L.C.**
25 Mills Avenue
Greenville, South Carolina 29605
(864) 242-6200
(864) 233-0290 (facsimile)
E-mail:  llouzri@fosterfoster.com
              nbax@fosterfoster.com

Attorneys for Defendant


Dated:  October 19, 2020

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
C.A. No.: 5:19-cv-00316**

BERKSHIRE LIFE INSURANCE COMPANY OF AMERICA,

Plaintiff,

vs.

AMRIKA RAMPERSAD,

     Defendant.

_____

**CERTIFICATE OF SERVICE**

     I hereby certify that on October 2, 2020, I electronically filed the foregoing Defendant's Response to Plaintiff's Rule 56.1 State of Material Facts with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to:

James A. Dean
N.C. State Bar No. 39623
Ryan H. Niland
N.C. State Bar No. 49430
Womble Bond Dickinson (US) LLP
One West Fourth Street
Winston-Salem, NC 27101
Phone: (336) 721-3600
Email: Jamie.Dean@wbd-us.com
      Ryan.Niland@wbd-us.com

                   s/ M. Leila Louzri_____
                   M. Leila Louzri, Esq.
                   N.C. Federal Bar #: 48743
                   Nathaniel W. Bax, Esq.
                   *Pro Hac Vice*
                   **FOSTER LAW FIRM, L.L.C.**
                   25 Mills Avenue
                   Greenville, South Carolina 29605
                   (864) 242-6200
                   (864) 233-0290 (facsimile)
                   E-mail: llouzri@fosterfoster.com

nbax@fosterfoster.com

Attorneys for Defendant

Dated:  October 19, 2020