IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:19-CV-316-D

| | | |
|---|---|---|
| BERKSHIRE LIFE INSURANCE COMPANY OF AMERICA, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | **ORDER** |
| AMRIKA RAMPERSAD, | ) ) ) | |
| Defendant. | ) ) | |

On July 25, 2019, Berkshire Life Insurance Company of America ("Berkshire" or "plaintiff") filed a complaint against Dr. Amrika Rampersad ("Rampersad" or "defendant") seeking a declaratory judgment that Rampersad's disability insurance policy was rescinded and void ab initio [D.E. 1]. After discovery closed, both parties moved for summary judgment and filed related materials. As explained below, the court grants Berkshire's motion for summary judgment and denies Rampersad's motion for summary judgment.

I.

In January 2017, Rampersad lived in Fort Myers, Florida, and worked as a general dentist at Riverdale Dental Associates ("Riverdale Dental"). See Rampersad Dep. [D.E. 38-1] 5. Although Rampersad purchased a disability income insurance policy from Berkshire in 2014, she sought additional disability income coverage due to increased income. See id. at 17–18. Rampersad hired Matthew Fine ("Fine") of insurance agency Robert Fine & Associates to help her. See id. at 18–19. Robert Fine & Associates is an agent of Berkshire and licensed to solicit applications for insurance

policies with Berkshire. See Rampersad Dep. [D.E. 34-1]. Fine and his agency conducted all communications with Berkshire. See [D.E. 38-1] 18–19.

On February 7, 2017, Rampersad applied for disability insurance. See [D.E. 34-2, 38-2, 41-1]. The application stated:

> 1. This Application for Disability Insurance: Part I, Application for Insurance: Part II – Health and Medical History, any required Representations to the Medical Examiner, and any other supplements or amendments to this Application for Disability Insurance: Part I will form the basis for, and become part of and attached to any policy or coverage issued and is herein referred to as the "Application."
>
> 2. All of the statements that are part of this Application are correctly recorded, and are complete and true to the best of the knowledge and belief of those persons who made them.
>
> 3. No agent, broker or medical examiner has any right to accept risks, make or change contracts, or to waive or modify any of the Company's rights or requirements.
>
> 4. Information provided by the applicant are representations and not warranties. Any misrepresentation or omission, if found to be material, may adversely affect acceptance of the risk, claims payment, or may lead to rescission of any policy that is issued based on this Application.
> . . .
>
> 6. The policy date is the date from which premiums are calculated and become due . . . [N]o Insurance shall take effect unless and until the policy is delivered, the first premium is paid, and there has been no change in the health, the income level, status of employment or occupation of the proposed insured.

[D.E. 34-2] 10; [D.E. 38-2] 10; [D.E. 41-1] 10.

Rampersad completed the Occupational Information section. See [D.E. 34-2] 4–5; [D.E. 38-2] 4–5; [D.E. 41-1] 4–5. It asked, "How many hours per week are you at work in this occupation?" Rampersad answered "40+." [D.E. 34-2] 4; [D.E. 38-2] 4; [D.E. 41-1] 4. The Occupational Information section also asked, "Do you plan to change your occupation, job, or employment within the next six months?" Rampersad answered "No." [D.E. 34-2] 5; [D.E. 38-2] 5; [D.E. 41-1] 5.

2

Rampersad read and signed part one of the disability income insurance application, which contained the Occupational Information section. See Rampersad Dep. [D.E. 38-1] 19.

On February 14, 2017, Rampersad also submitted the Application for Insurance: Part II – Health and Medical History ("Medical History"). See [D.E. 34-2] 16–19; [D.E. 38-3]; [D.E. 41-1] 16–19. The Medical History asked, "Are you currently receiving any medical advice, counseling, or treatment from a licensed physician for any medical . . . condition?" Rampersad answered "No." [D.E. 34-2] 17; [D.E. 38-3] 3; [D.E. 41-1] 17. The Medical History asked, "In the past ten years, have you been diagnosed or treated for . . . any disease or disorder of the joints, limbs, or muscles," and "[o]ther than previously stated in this [Medical History], have you . . . within the past 12 months had any diagnostic test(s) performed (except for HIV or AIDS)?" Rampersad answered "No." [D.E. 34-2] 17–18; [D.E. 38-3] 3–4; [D.E. 41-1] 17–18. The Medical History asked, "Other than previously stated in this [Medical History], have you . . . within the past 5 years had a physical exam or check-up of any kind," and "[o]ther than previously stated . . . have you within the past 5 years . . . been a patient in a hospital, clinic, or other medical or mental health facility?" Rampersad answered "Yes" to both and disclosed that she "had annual physicals & routine check ups." [D.E. 34-2] 18–19; [D.E. 38-3] 4–5; [D.E. 41-1] 18–19. The Medical History stated: "I understand and agree that the statements and answers in this [Medical History] are written as made by me; to the best of my knowledge and belief are full, complete and true; and that they shall be a part of the contract of insurance, if issued." [D.E. 34-2] 19; [D.E. 38-3] 5; [D.E. 41-1] 19. Rampersad read and signed the Medical History. See Rampersad Dep. [D.E. 38-1] 19.

On April 19, 2017, Berkshire approved Rampersad's coverage and issued Rampersad a disability insurance income policy with the policy number Z3585720 (the "5720 Policy") with a Policy Date of May 3, 2017. See [D.E. 34-3, 38-4, 41-2]. The 5720 Policy stated: "We have issued

3

the Policy in consideration of the representations in the application and payment of the first premium. . . . The Policy with any applications(s), Schedule Pages, and any attached riders, amendments, and endorsements make up the entire contract. No change in the Policy will be valid unless it has been endorsed on, or attached to, the Policy in writing by the president, a vice president, or the secretary of Berkshire Life." [D.E. 38-4] 23–24. The 5720 Policy did not take effect because Rampersad had not yet signed the delivery requirements or paid any premiums. See [D.E. 38-2] 10; [D.E. 41-1] 10.

On June 1, 2017, Rampersad read and signed the Policy Delivery Receipt, Declaration of Insurability, and Amendment to Application for the 5720 Policy (collectively, the "Delivery Requirements") and returned them to Berkshire on June 12, 2017. See [D.E. 34-4]; Rampersad Dep. [D.E. 38-1] 20; [D.E. 41-3]; [D.E. 41-4]. The 5720 Policy took effect on June 13, 2017, when Berkshire received Rampersad's first monthly premium payment of $125.23. See [D.E. 34-5]; [D.E. 38-6] 6–7; [D.E. 41-4].

In June 2017, Rampersad's husband accepted a job as a physician in Raleigh, North Carolina. See Rampersad Dep. [D.E. 38-1] 6–7; [D.E. 56] 5–7. On June 16, 2017, the North Carolina Board of Dental Examiners issued Rampersad a North Carolina dental license. See [D.E. 38-5]. Rampersad ended her employment at Riverdale Dental before she relocated to North Carolina in July 2017. See Rampersad Dep. [D.E. 38-1] 7.

Before June 13, 2017, a dental assistant at Riverdale Dental sprayed too much air into a patient's mouth, causing blood and saliva to splash onto Rampersad's face, under her goggles, and into her eyes. See id. at 14–15. Rampersad reported the incident to her physician at a wellness exam and asked her physician to test for blood-borne pathogens. See id. Rampersad asserts that she regularly asked for such tests due to her exposure to blood and saliva as a dentist. See [D.E. 56] 8.

4

While preparing to move to North Carolina, Rampersad tore a ligament and a tendon in her right ankle. See Rampersad Dep. [D.E. 38-1] 13, 15, 17. On June 26, 2017, Rampersad sought medical treatment for the ankle injury. Her doctor recommended surgery to repair the damage, and her ankle remained swollen for months. Although Rampersad is not sure on what date she suffered the ankle injury, Rampersad believes it occurred no more than a few days before June 26, 2017. See id. at 12; [D.E. 56] 8–9.

On July 15, 2017, Berkshire began automatically drafting premiums due for the 5720 Policy. See [D.E. 38-6] 6–7. Berkshire's first automatic draft charged $250.46, corresponding to the months of June and July. See id.; [D.E. 38-7]. Rampersad believed the charge to be a double charge. See Rampersad Dep. [D.E. 38-1] 21. After Rampersad discussed the possible double charge with Fine, see id., on July 24, 2017, Fine's agency asked Berkshire if Berkshire could change the Policy Date from May to June in order for Rampersad to skip the next month's payment. See [D.E. 34-6] 2; [D.E. 38-8] 12; [D.E. 41-5] 2. Berkshire does not change policy dates after a policy takes effect, but it will sometimes issue a new policy under a new policy number. See Cowdrey Decl. [D.E. 38-13] ¶¶ 13–14.

On July 25, 2017, Berkshire told Fine that the 5720 Policy's effective date was June 13, 2017. Berkshire also told Fine that in order for Rampersad to skip the next month's payment, "the client will need to resign deliveries as we'll have to reissue to a new policy number." [D.E. 38-8] 1–4. Fine replied, "Yes. Please go ahead. Client will sign new delivers [sic]." Id. at 2.

On July 25, 2017, Berkshire issued a new policy with a policy number Z3724950 (the "4950 Policy"). See [D.E. 34-15]; Cowdrey Decl. [D.E. 38-13] ¶ 22. On July 25, 2017, in North Carolina, Rampersad read and signed an Amendment concerning the 4950 Policy, which stated: "It is further represented that the statements and answers in said [Occupational Information and Medical History]

5

were complete and true when made and that no changes have occurred which would make said statements and answers incorrect or incomplete as of the present date." [D.E. 38-9] 3; see Rampersad Dep. [D.E. 38-1] 22–23. Rampersad also read and signed a Policy Delivery Receipt, which stated: "The Applicant/Insured represents that the statements and the answers in the . . . documents required as part of the application for the policy were complete and true when made, and that no changes have occurred that would make said statements and answers incorrect or incomplete as of the present date, except as amended or modified in any amendment(s) attached thereto." [D.E. 38-11]; see Rampersad Dep. [D.E. 38-1] 24. Rampersad also read and signed a Declaration of Insurability, which stated: "The undersigned represents that since the date of the earlier of [the Occupational Information or Medical History], no person proposed for insurance . . . [h]as had any disease, illness, or injury; . . . [h]as consulted or been treated by a doctor; . . . [or] [h]as had any change in occupation, income, [or] residence . . . ." [D.E. 38-10]; see Rampersad Dep. [D.E. 38-1] 23; see also [D.E. 34-13]. On July 25, 2017, Rampersad did not disclose that she had quit her job at Riverdale Dental, been exposed to a patient's blood, or injured her right ankle. Cf. Cowdrey Decl. [D.E. 38-13] ¶¶ 24–26 (asserting that had Rampersad disclosed these occurrences, Berkshire would not have issued the 4950 Policy).

After receiving the documents from Rampersad, Berkshire deemed the 5720 Policy rejected and applied Rampersad's premium payments to the 4950 Policy. See [D.E. 38-6] 7. The 4950 Policy took effect on July 25, 2017, the day Berkshire received the 4950 Delivery Requirements. See id. Berkshire applied the three months' worth of premiums it had received concerning the 5720 Policy towards the amount otherwise due on the 4950 Policy. See id.

In 2018, Rampersad injured her right leg while giving birth. See Rampersad Dep. [D.E. 38-1] 25. Rampersad filed two disability claims with Berkshire, one under her 2014 policy and the

6

other under the 4950 Policy. See id. at 17, 25; [D.E. 34-17]. Berkshire determined that Rampersad met the definition of "disability" under the 2014 policy and continues to pay Rampersad's claim under that policy. See Rampersad Dep. [D.E. 38-1] 17. After investigating Rampersad's claim under the 4950 Policy, Berkshire rescinded the 4950 Policy and refunded all the premiums Rampersad paid in connection with the 4950 Policy on March 27, 2019. See id. at 26; [D.E. 34-18]; [D.E. 38-12]; see also [D.E. 34-19, 34-20]. In rescinding the 4950 Policy, Berkshire concluded that Rampersad was not working full-time on June 25, 2017, and that she suffered two undisclosed injuries in June 2017. See [D.E. 38-12] 2–3. Rampersad refused to accept the recission and retained counsel. See Rampersad Dep. [D.E. 38-1] 26. On July 25, 2019, Berkshire filed this action. See [D.E. 1].

II.

Summary judgment is appropriate when, after reviewing the record as a whole, the court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a); Scott v. Harris, 550 U.S. 372, 380 (2007); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment must initially demonstrate the absence of a genuine issue of material fact or the absence of evidence to support the nonmoving party's case. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, see Anderson, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists for trial. See Anderson, 477 U.S. at 249. In making this determination, the court must view the evidence and the

7

inferences drawn therefrom in the light most favorable to the nonmoving party. See Harris, 550 U.S. at 378. "When cross-motions for summary judgment are before a court, the court examines each motion separately, employing the familiar standard under Rule 56 of the Federal Rules of Civil Procedure." Desmond v. PNGI Charles Town Gaming, L.L.C., 630 F.3d 351, 354 (4th Cir. 2011).

A genuine issue of material fact exists if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. See Anderson, 477 U.S. at 249. "The mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient...." Id. at 252; see Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) ("The nonmoving party, however, cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."). Only factual disputes that affect the outcome under substantive law properly preclude summary judgment. See Anderson, 477 U.S. at 248.

The parties' motions for summary judgment require the court to consider North Carolina state law claims. Accordingly, this court must predict how the Supreme Court of North Carolina would rule on any disputed state law issues. See Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co. of S.C., 433 F.3d 365, 369 (4th Cir. 2005). In doing so, the court must look first to opinions of the Supreme Court of North Carolina. See id.; Parkway 1046, LLC v. U.S. Home Corp., 961 F.3d 301, 306 (4th Cir. 2020); Stahle v. CTS Corp., 817 F.3d 96, 100 (4th Cir. 2016). If there are no governing opinions from that court, this court may consider the opinions of the North Carolina Court of Appeals, treatises, and "the practices of other states." Twin City Fire Ins. Co., 433 F.3d at 369 (quotation omitted).[1] In predicting how the highest court of a state would address an issue, this court must "follow the decision of an intermediate state appellate court unless there [are] persuasive data

---

[1] North Carolina does not have a mechanism to certify questions of state law to its Supreme Court. See Town of Nags Head v. Toloczko, 728 F.3d 391, 398 (4th Cir. 2013).

8

that the highest court would decide differently." Town of Nags Head v. Toloczko, 728 F.3d 391, 398 (4th Cir. 2013) (quotation omitted); see Hicks v. Feiock, 485 U.S. 624, 630 n.3 (1988). Moreover, in predicting how the highest court of a state would address an issue, this court "should not create or expand a [s]tate's public policy." Time Warner Ent.-Advance/Newhouse P'ship v. Carteret-Craven Elec. Membership Corp., 506 F.3d 304, 314 (4th Cir. 2007) (alteration and quotation omitted); see Day & Zimmermann, Inc. v. Challoner, 423 U.S. 3, 4 (1975) (per curiam); Wade v. Danek Med., Inc., 182 F.3d 281, 286 (4th Cir. 1999).

A.

The parties dispute when the 4950 Policy took effect. Rampersad contends that the 4950 Policy took effect on June 13, 2017, excusing her from disclosing any events occurring after that date. See [D.E. 34] 13–19. In support, Rampersad argues that Berkshire never said it would issue a new policy. Rather, Berkshire employees and agents told Rampersad that Berkshire would reissue or redate her current policy. See id. Rampersad also contends that Berkshire repeatedly represented the 4950 Policy's effective date as June 13, 2017. See id. Thus, Rampersad asserts that she did not have to disclose events occurring after June 13, 2017. See id.; see also [D.E. 55] 6–7.

Berkshire responds that the 4950 Policy took effect on July 25, 2017, not June 13, 2017. See [D.E. 39] 9–11. In support, Berkshire argues that alleged representations by Berkshire employees or its agents cannot override the plain language of the 4950 Policy. See id. at 9–10. Berkshire also argues that Rampersad erroneously conflates the 4950 Policy with the 5720 Policy. See id. at 10. Lastly, Berkshire argues that even were the 4950 Policy a continuation of the 5720 Policy, Rampersad materially misrepresented her employment status and medical history. See id. at 10–11. Thus, Berkshire argues that it properly rescinded the 4950 Policy. See id. at 11.

In North Carolina, courts determine issues of contract construction based on the state where

9

the contract was made. See Smith v. Cent. Soya of Athens, Inc., 604 F. Supp. 518, 523 (E.D.N.C. 1985); Tanglewood Land Co. v. Byrd, 299 N.C. 260, 262, 261 S.E.2d 655, 656 (1980). Rampersad signed the 4950 Policy after she moved to North Carolina; therefore, the court interprets it according to North Carolina's substantive law of contracts, including North Carolina's parol evidence rule. See Smith, 604 F. Supp. at 523; see also Rampersad Dep. [D.E. 38-1] 6–7, 22–23; [D.E. 56] 5–7.

A party cannot use parol evidence to "vary, add to, or contradict a written instrument" intended to be a final integration of a transaction. Van Harris Realty, Inc. v. Coffey, 41 N.C. App. 112, 115, 254 S.E.2d 184, 186 (1979); see Hoots v. Calaway, 282 N.C. 477, 486, 193 S.E.2d 709, 715 (1973); Lassiter v. Bank of N.C., 146 N.C. App. 264, 269, 551 S.E.2d 920, 923 (2001); Hall v. Hotel L'Europe, Inc., 69 N.C. App. 664, 666, 318 S.E.2d 99, 101 (1984). "Any or all parts of a transaction prior to or contemporaneous with a writing intended to record them finally are superseded and made legally ineffective by the writing." Coffey, 41 N.C. App. at 115; 254 S.E.2d at 186 (quotation omitted); see Thompson v. First Citizens Bank & Tr. Co., 151 N.C. App. 704, 708–09, 567 S.E.2d 184, 188 (2002); Harrell v. First Union Nat'l Bank, 76 N.C. App. 666, 667, 334 S.E.2d 109, 110 (1985), aff'd, 316 N.C. 191, 340 S.E.2d 111 (1986). "Thus, it is assumed the parties signed the instrument they intended to sign, and absent evidence or proof of mental incapacity, mutual mistake of the parties, undue influence, or fraud, the court does not err in refusing to allow parol evidence." Thompson, 151 N.C. App. at 709, 567 S.E.2d at 188 (quotation and alterations omitted); see N.C. State Bar v. Merrell, 243 N.C. App. 356, 371, 777 S.E.2d 103, 114 (2015); Drake v. Hance, 195 N.C. App. 588, 591, 673 S.E.2d 411, 413 (2009).

North Carolina recognizes a few exceptions to the parol evidence rule. For example, parol evidence "is admissible to show conditions precedent . . . that go[] to the very existence of the contract and tend[] to show that no valid and effective contract ever existed. Bailey v.

10

Westmoreland, 251 N.C. 843, 845, 112 S.E.2d 517, 520 (1960); accord Coffey, 41 N.C. App. at 115, 254 S.E.2d at 186. Similarly, parol evidence is also sometimes admissible to resolve an ambiguous term. See Drake, 195 N.C. App. at 591, 673 S.E.2d at 413; Crider v. Jones Island Club, Inc., 147 N.C. App. 262, 266–67, 554 S.E.2d 863, 866–67 (2001); Vestal v. Vestal, 49 N.C. App. 263, 266–67, 271 S.E.2d 306, 309 (1980).

"As a general rule, the parties may agree as to the terms and conditions and effective date of a policy of insurance, provided, of course, that they do so voluntarily, and are not influenced by fraud, misrepresentation or similar elements, and that the terms and conditions are not in violation of legal rules and requirements." McCallum v. Old Republic Life Ins. Co., 259 N.C. 573, 577, 131 S.E.2d 435, 438 (1963). "The parties may expressly agree that a policy of insurance be antedated and take effect from that date." Id. "If the policy is dated, . . . the contract of insurance is deemed to have been made as of that date, and takes effect therefrom, unless a different day is specified therein, or it is apparent from the construction of the contract that another day was intended." Id.

The parol evidence rule bars Rampersad from introducing evidence outside of the written 4950 Policy. The 4950 Policy represents the final integration of the insurance agreement; therefore, evidence of prior or contemporaneous communications concerning the effective date are not permitted. The effective date also is not an ambiguous term or a condition precedent. Moreover, nothing in the 4950 Policy suggests fraud or misrepresentation or that the parties intended the effective date to be June 13, 2017. Accordingly, no genuine issue of material fact exists as to the effective date of the 4950 Policy, and the court holds that the effective date is July 25, 2017. Furthermore, under the parol evidence rule, Rampersad cannot use alleged statements by Berkshire's employees or agents to contradict this effective date.

In opposition, Rampersad attempts to disclaim knowledge of the documents she signed

11

concerning the 5720 Policy and the 4950 Policy. However, parties are charged with knowledge of the contracts they sign, particularly when, as here, they had the opportunity to review the documents before signing them. See Goodwin v. Invs. Life Ins. Co. of N. Am., 332 N.C. 326, 330–31, 419 S.E.2d 766, 768–69 (1992); Morgan v. Lexington Furniture Indus., Inc., 180 N.C. App. 691, 639 S.E.2d 141, 2006 WL 3717555, at *2 (2006) (unpublished table decision). "The law presumes that the [party] knew the contents of the [document] she signed" . . . "in the absence of any proof of fraud or mistake." Goodwin, 332 N.C. at 330–31, 419 S.E.2d at 768–69; see Burch v. Lititz Mut. Ins. Co., No. 7:12-CV-107-FL, 2013 WL 6080191, at *4 (E.D.N.C. Nov. 19, 2013) (unpublished); Jones v. Home Sec. Life Ins. Co., 254 N.C. 407, 413, 119 S.E.2d 215, 219–20 (1961); Holzworth v. Nationwide Mut. Fire Ins. Co., 172 N.C. App. 170, 616 S.E.2d 29, 2005 WL 1804346, at *2 (2005) (unpublished table decision). A party who signs a written instrument has a duty to read it before signing and "cannot avoid its effect on the ground that at the time she signed the paper she did not read it or know its contents." Holzworth, 2005 WL 1804346, at *3 (alterations and quotation omitted); see Harrison v. S. Ry. Co., 229 N.C. 92, 95, 47 S.E.2d 698, 700 (1948); Morgan, 2006 WL 3717555, at *2; Park v. Merrill Lynch, 159 N.C. App. 120, 126, 582 S.E.2d 375, 380 (2003) ("[A] signed paper writing demonstrates full knowledge and assent as to what is contained therein."). This principle even applies where an insured has received negligent advice from the insurance company's insurance agent. See Am. Gen. Life Ins. Co. v. Cannon ex rel. Buck, No. 4:09-CV-64-D, 2010 WL 2232267, at *5–6 (E.D.N.C. June 2, 2010) (unpublished); Simpson v. Life Invs. Ins. Co. of Am., 367 F. Supp. 2d 875, 879–80 (M.D.N.C. 2005); Goodwin, 332 N.C. at 330, 419 S.E.2d at 768; Bell v. Nationwide Ins. Co., 146 N.C. App. 725, 728, 554 S.E.2d 399, 401 (2001).

Rampersad read and signed the Occupational Information, Medical History, Amendments, Delivery Receipts, and Declarations of Insurability for both the 4950 Policy and the 5720 Policy.

12

See Rampersad Dep. [D.E. 38-1] 19–20, 22–24; [D.E. 38-9]; [D.E. 38-10]; [D.E. 38-11]; [D.E. 41-3]; [D.E. 41-4]. The application described when both the 5720 Policy and 4950 Policy would take effect. See [D.E. 34-2] 10; [D.E. 38-2] 10; [D.E. 41-1] 10. Moreover, the 4950 Policy Delivery Requirements listed a new policy number and required Rampersad to disclose updated information about her health and employment. See [D.E. 38-9, 38-10, 38-11]. Furthermore, the insurance application stated that no employee or agent had the authority to modify the contract's written terms. See [D.E. 34-2] 10; [D.E. 38-2] 10; [D.E. 41-1] 10 ("No agent, broker or medical examiner has any right to accept risks, make or change contracts, or to waive or modify any of the Company's rights or requirements."); see also [D.E. 38-4] 23–24 ("The Policy with any application(s), Schedule Pages, and any attached riders, amendments, and endorsements make up the entire contract. No change in the Policy will be valid unless it has been endorsed on, or attached to, the Policy in writing by the president, a vice president, or the secretary of Berkshire Life. No agent or broker has authority to change the Policy or waive any of its provisions."). Thus, even assuming Fine or a Berkshire employee told Rampersad the effective date of the 4950 Policy was June 13, 2017, and that the parol evidence rule did not bar introduction of such communications, Rampersad is still charged with the knowledge that the effective date of the 4950 Policy was July 25, 2017. Accordingly, even viewing the evidence in the light most favorable to Rampersad, no reasonable jury could find that Rampersad was unaware that the 4950 Policy was a new policy with a new effective date of July 25, 2017.

B.

Berkshire argues that Rampersad materially misrepresented her employment status concerning the 4950 Policy. See [D.E. 39] 8–9. Berkshire also contends that Rampersad was no longer working when she signed the 4950 Delivery Requirements. See id.

Rampersad responds that she did not experience a change in occupation before her asserted

13

effective date of June 13, 2017. See [D.E. 55] 1–4. Rather, Riverdale Dental employed Rampersad until the end of June 2017. See id. at 2. Rampersad also contends that her employment status is not material because Berkshire markets the disability policy at issue to dentists and contemplates that dentists will change jobs. See id. at 3–4. Rampersad also argues that her employment status did not materially change, and she actively pursued full-time employment when she moved to North Carolina. See id.

Berkshire replies that Rampersad's employment status is material. See [D.E. 52] 2–3. Moreover, Rampersad had quit her job at Riverdale Dental by July 25, 2017, and her pursuit of full-time employment in North Carolina does not remedy the change in employment status. See id. at 2.

"[M]aterial misrepresentations in an application for an insurance policy may prevent recovery on the policy." Luther v. Seawell, 191 N.C. App. 139, 144, 662 S.E.2d 1, 4 (2008). "[A]n applicant's representations in an insurance application regarding [her] health are material as a matter of law." Busch v. Ohio Nat'l Life Assurance Corp., No. 5:09-CV-355-D, 2011 WL 902298, at *4 (E.D.N.C. Mar. 14, 2011) (unpublished); see Ward v. Durham Life Ins. Co., 325 N.C. 202, 210, 381 S.E.2d 698, 702 (1989); Tharrington v. Sturdivant Life Ins. Co., 115 N.C. App. 123, 127, 443 S.E.2d 797, 800 (1994) (collecting cases); Pittman v. First Prot. Life Ins. Co., 72 N.C. App. 428, 433, 325 S.E.2d 287, 291 (1985). As for misrepresentations unrelated to the applicant's health, "a representation in an application for an insurance policy is deemed material if the knowledge or ignorance of it would naturally influence the judgment of the insurer in making the contract." Goodwin, 332 N.C. at 331, 419 S.E.2d at 769 (quotation omitted); see Laschkewitsch v. Legal & Gen. Am., Inc., 247 F. Supp. 3d 710, 718 (E.D.N.C. 2017), aff'd, 725 F. App'x 252 (4th Cir. 2018) (per curiam) (unpublished); Luther, 191 N.C. App. at 144; 662 S.E.2d at 4. The test for materiality

14

is subjective, and courts consider whether "there is a strong logical relationship between the question asked, assessing the risk, and the ultimate determination." Goodwin, 332 N.C. at 332, 419 S.E.2d at 769; see Burch, 2013 WL 6080191, at *6; Johnson v. Household Life Ins. Co., No. 5:11-CV-301-BR, 2012 WL 5336959, at *5 (E.D.N.C. Oct. 26, 2012) (unpublished); Bell, 146 N.C. App. at 726–27, 554 S.E.2d at 401. Material misrepresentations will void an insurance policy even if made unintentionally. See Laschkewitsch, 247 F. Supp. 3d at 718; Rhinehardt v. N.C. Mut. Life Ins. Co., 254 N.C. 671, 673, 119 S.E.2d 614, 616 (1961) (per curiam); Tharrington, 115 N.C. App. at 128, 443 S.E.2d at 801.

In applying for disability insurance, an applicant's income level and employment status are material. See Paul Revere Life Ins. Co. v. Rasul, No. Civ. AMD 97-829, 1998 WL 259922, at *5 (D. Md. May 18, 1998) (unpublished); see also Mut. Benefit Life Ins. Co. v. Lindenman, 911 F. Supp. 619, 626 (E.D.N.Y. 1995). Moreover, in applying for life insurance, employment status is material. See Laschkewitsch v. Lincoln Life & Annuity Distribs., Inc., 47 F. Supp. 3d 327, 334 (E.D.N.C. 2014); Evans v. Enter. Gen. Ins. Agency, Inc., No. AW-07-0250, 2008 WL 11509661, at *3–4 (D. Md. Aug. 7, 2008) (unpublished); see also New Eng. Life Ins. Co. v. Taverna, No. 00-CV-2400 (ILG), 2002 WL 718755, at *11 (E.D.N.Y. Mar. 1, 2002) (unpublished).

Rampersad's employment status is material to the issuance of the disability insurance policy. The Delivery Requirements required Rampersad to disclose "any change in occupation, income, [or] residence" since the date she first completed the Occupational Information. [D.E. 38-10]. Rampersad, however, misrepresented her employment status in the 4950 Delivery Requirements when she failed to disclose that she no longer worked for Riverdale Dental. Rampersad failed to make these disclosures on July 25, 2017, after she moved to North Carolina and quit her job with Riverdale Dental. Had Berkshire known that Rampersad had quit her job, it would not have issued

15

the policy. See Cowdrey Decl. [D.E. 38-13] ¶¶ 24–26; Goodwin, 332 N.C. at 331, 419 S.E.2d at 769; Luther, 191 N.C. App. at 144; 662 S.E.2d at 4; Laschkewitsch, 247 F. Supp. 3d at 718.

Alternatively, even if June 13, 2017, were the operative date, Rampersad knew by that date that she planned to move to North Carolina. After all, Rampersad obtained her dental license in North Carolina on June 16, 2017. Thus, Rampersad's "No" response to the question "Do you plan to change your occupation, job, or employment within the next six months" was materially false on June 13, 2017. Accordingly, Rampersad's material misrepresentation about her employment warrants rescission of the 4950 Policy.

C.

Berkshire contends that Rampersad's misrepresentation concerning her ankle injury is material. See [D.E. 39] 8–9. Rampersad responds that she made no material misrepresentation concerning her ankle injury. See [D.E. 55] 5–6. In support, Rampersad notes that because she sought treatment for an acute ankle injury on June 26, 2017, she must have suffered the injury in the days immediately before that date. See id. at 6.

Rampersad admits that her ankle injury occurred in late June, approximately a month before she signed the Delivery Requirements for the 4950 Policy. The documents required Rampersad to disclose any "disease, illness, or injury" and whether she had "consulted or been treated by a doctor." [D.E. 38-10]; see [D.E. 38-9; 38-11]. Rampersad did not disclose that a doctor had treated her for an ankle injury in late June 2017. Misrepresentations about health are material for purposes of a disability insurance application. See Busch, 2011 WL 902298, at *4; Tharrington, 115 N.C. App. at 127, 443 S.E.2d at 800; Pittman, 72 N.C. App. at 433, 325 S.E.2d at 291. Accordingly, Rampersad made a material misrepresentation in failing to disclose her ankle injury that warrants recision of the 4950 Policy.

16

D.

Berkshire contends that Rampersad made a material misrepresentation when she failed to disclose that she had been exposed to a patient's blood. See [D.E. 39] 8–9; [D.E. 48] 2. Rampersad responds that her exposure to a patient's blood does not count as an illness, disease, or injury under Policy 4950. See [D.E. 55] 4–5. In support, Rampersad asserts that as a dentist she was regularly exposed to patients' bodily fluids. See id. at 4. Thus, she regularly requested tests for blood-borne pathogens at wellness exams. Moreover, Rampersad argues that she disclosed on her initial application that she regularly went for annual physicals. See id. at 5.

Berkshire replies that the blood exposure was an accident or injury that Rampersad had to disclose. See [D.E. 52] 3. In support, Berkshire notes that Rampersad had to flush her eyes out with water for 15 minutes, reported the incident to her office manager, and asked for medical documentation about the patient's potential exposure to blood-borne pathogens. See id.

Under North Carolina law, interpreting a written contract is a question of law for the court. See Briggs v. Am. & Efird Mills, Inc., 251 N.C. 642, 644, 111 S.E.2d 841, 843 (1960); N.C. Farm Bureau Mut. Ins. Co. v. Mizell, 138 N.C. App. 530, 532, 530 S.E.2d 93, 95 (2000). When interpreting a written insurance policy:

> [T]he goal of construction is to arrive at the intent of the parties when the policy was issued. Where a policy defines a term, that definition is to be used. If no definition is given, non-technical words are to be given their meaning in ordinary speech, unless the context clearly indicates another meaning was intended. The various terms of the policy are to be harmoniously construed, and if possible, every word and every provision is to be given effect. . . .

Gaston Cnty. Dyeing Mach. Co. v. Northfield Ins. Co., 351 N.C. 293, 299–300, 524 S.E.2d 558, 563 (2000) (quotation omitted); see Plum Props., LLC v. N.C. Farm Bureau Mut. Ins. Co., 254 N.C. App. 741, 744, 802 S.E.2d 173, 175 (2017); Mizell, 138 N.C. App. at 532–33, 530 S.E.2d at 95. A court

may only engage in judicial construction where the language used in the policy is ambiguous. See Mizell, 138 N.C. App. at 532, 530 S.E.2d at 95. Coverage clauses are interpreted broadly and exclusionary coverages are construed narrowly. See Plum Props., 254 N.C. App. at 744–45, 802 S.E.2d at 175–76. Language is not ambiguous, however, "simply because the parties contend for differing meanings to be given to the language." Mizell, 138 N.C. App. at 532, 530 S.E.2d at 95.

Here, the issue turns on what counts as an "injury" or "accident" that Rampersad was required to disclose. An "injury" is a "[h]urt or loss caused to or sustained by a person or thing." Injury, Oxford English Dictionary (online ed.). An "accident" is "an unfortunate and typically unforeseen event." Accident, Oxford English Dictionary (online ed.); see [D.E. 47] 4 (relying on Merriam-Webster to define "accident" as "an unforeseen and unplanned event or circumstance" (quotation omitted)). Thus, whether Rampersad was required to disclose the blood exposure depends on whether the incident caused her a hurt or loss or was an unforeseen event.

A genuine issue of material fact exists regarding whether Rampersad's exposure to a patient's blood is an "injury" or "accident" for the purposes of the insurance application. Although Rampersad contends she was regularly exposed to patients' bodily fluids, see [D.E. 55] 4, Berkshire contends that the incident in question was unusual because the blood went behind Rampersad's goggles, requiring a 15-minute eye rinse. See [D.E. 52] 3. Berkshire contends that this incident rises to the level of being an "accident" for purposes of the application. See id. A reasonable jury, however, could find that Rampersad's blood exposure did not rise to that level because of her routine exposure to blood and other bodily fluids. Accordingly, a genuine issue of material fact exists concerning whether Rampersad's failure to disclose her blood exposure was a misrepresentation.[2]

---

[2] If the court were to find a misrepresentation, it would be material. See Busch, 2011 WL 902298, at *4; Tharrington, 115 N.C. App. at 127, 443 S.E.2d at 800; Pittman, 72 N.C. App. at 433,

Whether Rampersad made a material misrepresentation about the alleged "injury" or "accident" involving blood exposure does not affect the overall disposition of the cross-motions for summary judgment. Rather, as explained, Rampersad made material misrepresentations about her employment status and ankle injury. Had Berkshire known of these changes, it would not have issued the policy as it did. See Cowdrey Decl. [D.E. 38-13] ¶¶ 24–26. Accordingly, the 4950 Policy is rescinded. This conclusion dooms Rampersad's counterclaim for breach of contract.

### III.

In sum, the court GRANTS plaintiff's motion for summary judgment [D.E. 36], DENIES defendant's motion for summary judgment [D.E. 33], and DENIES AS MOOT defendant's motion to amend the scheduling order [D.E. 32]. Plaintiff may file a motion for costs in accordance with the Federal Rules of Civil Procedure and this court's Local Rules. The clerk shall close the case.

SO ORDERED. This **27** day of August, 2021.

                                                    JAMES C. DEVER III
                                                    United States District Judge

---

325 S.E.2d at 291.